**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SPARK ENERGY GAS, LP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:11-cv-1120 |
| | § | |
| TOXIKON CORPORATION, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## PLAINTIFF'S SUR-REPLY IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

Dated:   June 27, 2011

Respectfully submitted,

_____/s/ *Joshua C. Thomas*_____
Joshua C. Thomas
Glen Shu
Michelle Pector
Baker Hostettler, LLP
1000 Louisiana Suite 2000
Houston, Texas 77002
713.646.1322 (telephone)
713.751.1717 (facsimile)

**Counsel for Plaintiff Spark Energy Gas, LP**

## TABLE OF CONTENTS

I.   SUMMARY OF THE ARGUMENT ...................................................................1

II.  THE FACTS AND THE LAW SUPPORT SPECIFIC JURISDICTION ..................2

    A.   Undisputed Evidence Shows that Patriot Was Toxikon's Agent ....................2

    B.   Spark Has Not "Refused to Produce" the Spark-Patriot Agreement ..............4

    C.   Patriot Had No Authority to Enter into any Contract on Spark's Behalf ................................................................................................................6

    D.   Toxikon Improprly Ignores the First Agreement with Spark ........................9

    E.   Spark's Claim Arises Out of Toxikon's Forum Related Contacts, which Occurred from 2007 until 2010 ..........................................................11

    F.   Spark's Performance Was Exclusively in Texas, and There Was no Other Place it Could Have Been ...................................................................12

    G.   Houston Was the Hub of Activity .................................................................14

    H.   Toxikon Directly Contacted Spark Many Times ..........................................15

    I.   *Moncrief* is not the "Most Important Authority" and does not Support Toxikon's Argument .....................................................................................15

III.  GENERAL JURISDICTION EXISTS OVER TOXIKON....................................16

IV.  VENUE SHOULD REMAIN IN THIS COURT ...................................................16

    A.   Private Factors Weigh Against Transfer ......................................................16

    B.   Public Factors Weigh Against Transfer .......................................................18

V.   CONCLUSION ....................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174,
    85 L.Ed.2d 528 (1985) ............................................................................... 11

*Jones v. Petty-Ray Geophysical, Geosource, Inc.*, 954 F.2d 1061 (5th Cir. 1992) .............. 16

*Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999) ........................................................ 4

*McFadin v. Gerber*, 587 F.3d 753 (5th Cir. 2009) ................................................................ 11

*Moncief Oil Int'l, Inc. v. OAO Gazprom*, 481 F.3d 309 (5th Cir. 2007) .............................. 15

*Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374 (5th Cir. 2002) ..................... 11

*Transplace Texas, L.P. v. Higgins*, No. 4:10-cv-428, 2011 WL 623172
    (E.D. Tex. Jan. 19, 2011) ........................................................................... 11

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SPARK ENERGY GAS, LP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:11-cv-1120 |
| | § | |
| TOXIKON CORPORATION, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**PLAINTIFF'S SUR-REPLY IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS OR TRANSFER VENUE**

Plaintiff Spark Energy Gas, LP ("Spark") files this Sur-Reply in Opposition to Defendant Toxikon Corporation's ("Toxikon") Motion to Dismiss or Transfer Venue ("Motion," Dkt. No. 12). This Sur-Reply is filed to respond to new evidence filed by Toxikon with its Reply to Plaintiff's Response to Defendant's Motion to Dismiss or Transfer Venue ("Reply," Dkt. No. 19).[1]

## I.      SUMMARY OF THE ARGUMENT

Toxikon contracted to buy gas from Spark at a fixed price for five years. The market price of gas went down instead of up, and Toxikon no longer wished to honor that agreement. Toxikon tells a story about Patriot Energy Management, Inc. ("Patriot") being Spark's agent, and not Toxikon's. Not only is that story completely contradicted by indisputable documentary evidence, but everything about Toxikon's story is a smokescreen. Significantly, Toxikon would not be alleging this story if natural gas was trading at $15 per dekatherm, because Toxikon would be buying all the gas it could get for $12.

Toxikon's theory that Patriot acted as Spark's agent, and not Toxikon's, is contrary to the clear documentary evidence in the record. Patriot was unquestionably Toxikon's agent. Specific

---

[1] The nature and stage of the case is set forth in Spark's Response to Defendant's Motion to Dismiss or Transfer Venue ("Response," Dkt. No. 17), and is incorporated herein by reference.

1

jurisdiction exists over Toxikon because it: initiated contact with Spark through its agent, Patriot; negotiated a contract with Spark in Texas through Patriot; entered into two contracts with Spark, a Texas resident, which created continuing obligations and business activity in Texas; accepted gas from Spark; accepted invoices from Spark; paid invoices to Spark in Houston; and communicated with Spark in Texas, both directly and through Patriot.  In order to minimize its forum contacts, Toxikon asks the Court to do what it does:  ignore the first Agreement with Spark.  However, the proper test is not whether Toxikon's forum contacts all occurred under the contract that was breached.  The proper test is whether Spark's claim arises out of Toxikon's forum contacts, and in this case Toxikon's forum contacts began with the first Agreement in May 2007.

Spark performed every necessary function to provide the gas to Toxikon from its Houston, Texas headquarters, and despite Toxikon's attempts to muddy the waters with irrelevant documents from another lawsuit, Houston was the only place where Spark could have performed.  Toxikon's new "evidence" does not establish that Spark had any other office, much less an office where it could have performed the contracts with Toxikon.

Finally, Toxikon has failed to meet its burden to show good cause for transfer to Massachusetts, or that transfer to Massachusetts is clearly more convenient.  Therefore Spark's choice of forum should not be disturbed.

## II.    THE FACTS AND THE LAW SUPPORT SPECIFIC JURISDICTION

### A.    Undisputed Evidence Shows that Patriot Was Toxikon's Agent

It is beyond doubt that Patriot was Toxikon's agent when it entered into the Agreements with Spark.  On May 8, 2007, Dexter Williams, acting as the Chief Financial Officer of Toxikon,

> Appoint[ed] Patriot Energy Management, Inc. (collectively referred to as the "Agent") as its agent to act in its name, place and stead in any way which it could act with respect to researching, *negotiating, executing*, terminating,

rescinding and delivering, *energy product and service agreements with competitive energy suppliers*. …

[G]rant[ed] the Agent an exclusive right to, among other things, *enter into agreement(s) with competitive energy suppliers*.

Agree[d] that [Toxikon] will be bound by any *agreement(s)* entered into with competitive suppliers by Agent on behalf of the undersigned.

Agree[d] that *any third party receiving a duly executed copy or facsimile of this Appointment of Agent may act hereunder* ….

(Dkt. No. 17, Ex. 15, at TOXIKON 1, 3 (emphasis added)).[2]  This document is unambiguous and unquestionably establishes that Patriot was Toxikon's agent with the authority to negotiate and enter into any agreements, single or multiple, with any competitive energy supplier (including Spark) on Toxikon's behalf.

Also on May 8, 2007, Mr. Williams signed Patriot's form setting forth the terms of the first Agreement with Spark, to purchase gas at a fixed unit price of $12.08, for period of 36 months.  (Dkt. No. 17, Ex. 15, at TOXIKON2).  Then on May 9, 2007, Mr. Williams signed off on the terms of the second Agreement with Spark, to purchase gas at the same fixed unit price, for a period of 24 months, "June 2010 Start."  (*Id*. at TOXIKON4).

Despite the unquestionable authority Toxikon granted Patriot in the Appointment of Agent, Mr. Desai and Mr. Williams surprisingly give sworn testimony to the contrary.   In particular, Dexter Williams swears:  "I did not intend to authorize Patriot to sign agreements on Toxikon's behalf."  (Dkt. No. 19, Ex. 13, ¶¶5, 7).  Laxman Desai also swore that "Patriot … was not authorized by Toxikon to sign the alleged contract." (Motion, Ex. 4, ¶4).  Regardless of what was "intended" by Mr. Williams, the Appointment of Agent unambiguously authorized Patriot to "*enter into agreement(s) with competitive energy suppliers*" on Toxikon's behalf.  (Dkt. No. 17, Ex. 5).

---

[2] A better copy of the Appointment of Agent is at Dkt. No. 17, Ex. 5, at SPARK000015.

Mr. Williams also swears,  "I did not authorize Patriot to sign a gas supply agreement with anyone, including Spark Energy Gas, LP, that was to start in June 2010."  (Dkt. No. 19, Ex. 13, ¶7).  This statement is squarely contradicted by the document he signed, and Toxikon itself produced in this lawsuit, authorizing a fixed unit price agreement for a period of 24 months, "June 2010 Start." (Dkt. No. 17, Ex. 15, at TOXIKON2).

The Court "must … resolve in favor of the plaintiff any factual conflicts posed by the affidavits." *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999).   Nonetheless, that presumption is hardly even necessary here, where Toxikon's declarations are so clearly refuted by unambiguous documents that they cannot be fairly read to create any real "conflict."  There is simply no doubt that Patriot was Toxikon's agent, and had authority to negotiate and enter into both Agreements with Spark.

## B.      Spark Has Not "Refused to Produce" the Spark-Patriot Agreement

Toxikon requested, for the first time on May 31, 2011, copies of any contracts between Spark and Patriot in document requests attached to its deposition notices.  (Exhibit B, Part II – Document Requests).  Spark promptly agreed to produce the contract between Spark and Patriot, if any, that was in place in May 2007.  Two days later, Spark located the contract in question, an agreement between Spark and Patriot dated February 9, 2007 (the "Patriot Agreement").  Spark agreed to produce it immediately upon Toxikon's agreement to a standard confidentiality order, and sent a draft to Toxikon's counsel on June 3, 2011, a week prior to the depositions.  (Exhibit C).  Toxikon's counsel refused to agree to the Confidentiality Order – not because Toxikon had any problem with the proposed order itself – but because he maintained "[t]here is no need for it."  (Exhibit D).   Toxikon's counsel never provided any proposed revisions to the draft Confidentiality Order.

4

On June 7, 2011, Spark again offered to produce the Patriot Agreement subject to Toxikon's execution of the Confidentiality Order (Exhibit E).   Another offer to produce the Patriot Agreement, subject to the Confidentiality Order, was made on the morning of June 9, 2011, just before the depositions.  During the deposition, Spark offered no less than ***twelve times*** to produce the Patriot Agreement, subject to the Confidentiality Oder.  (*See* Exhibit A, Deposition of Drew Henderson, at pp. 30, 32, 69, 100, 104, 105, 116, 121, 122, 124, 134). Toxikon's representation to this Court that Spark "refused to produce" the Patriot Agreement is flat wrong.

To date, Toxikon has not identified a single provision of the proposed confidentiality order that is objectionable.  Instead, Toxikon simply refuses to believe that Spark legitimately considers the Patriot Agreement to be confidential.  (*See* Exhibit D).  Had Toxikon agreed to the confidentiality order, it would have been able to:  (1) obtain an unredacted copy of the Patriot Agreement well in advance of the depositions; (2) discuss the Patriot Agreement with any Toxikon employee or agent who was involved in Toxikon's preparation for this litigation; (3) ask Mr. Henderson questions about the Patriot Agreement, in both his individual capacity and as a corporate representative; (4) file the Patriot Agreement as an exhibit, under seal, to its Reply; and (5) challenge Spark's designation of the Patriot Agreement as "Confidential" if it chose to do so. Spark reiterates that it is ready, willing, and able to produce the unredacted Patriot Agreement to Toxikon immediately upon Toxikon signing an Agreed Confidentiality Order.    Toxikon's refusal to execute the Confidentiality Order is, therefore, suspect.  Indeed, rather than agreeing to the Confidentiality Order, Toxikon sought to ambush Mr. Henderson in his deposition by asking questions about a confidential agreement between Spark *and a different broker*, which Toxikon assumes, without evidentiary support, contains the same terms as the Patriot Agreement.  (Dkt.

No. 19, pg. 12 & Ex. 18).  Toxikon's counsel clearly tried (but failed) to elicit testimony from

Mr. Henderson that was inconsistent with the terms of the Patriot Agreement.[3]

To avoid this Court's jurisdiction, Toxikon desperately attempts to turn the relationship

between Spark, Patriot, and Toxikon upside-down.  Toxikon argues that Patriot was acting as

Spark's agent in 2007, and even goes so far as to claim – despite the plain words on the

Appointment of Agent – there is "substantial evidence" that Patriot *was not* Toxikon's agent.

(Dkt. No. 19, at p. 41).  In an attempt to make it's case that Patriot was Spark's "undisclosed

agent," Toxikon relies on Exhibit 18, an unexecuted, unrelated, inadmissible contract between

Spark and a different broker.  (*Id*. at p. 11–13, Ex. 18).  Toxikon claims with this document to

"have substantial evidence proving what [the Patriot Agreement] says."  (Dkt. No. 19, p. 12).

This inadmissible "evidence" is not executed, authenticated, relevant or "substantial."[4]

Accordingly, it should be disregarded.

### C.      Patriot Had No Authority to Enter into any Contract on Spark's Behalf

"Patriot does not have the right to bind Spark Energy into an agreement."  (Exhibit A, at

128:2–5).  It is clear from Toxikon's Appointment of Agent that Patriot did become Toxikon's

agent, with full authority to bind Toxikon.  (Dkt. No. 17, Ex. 5, at SPARK000015).  It is equally

clear that Patriot had no authority to bind Spark.  The Patriot Agreement will clearly demonstrate

that Patriot lacked any such authority.  But because Toxikon refuses to enter into, or even

---

[3] Mr. Henderson properly declined to answer certain deposition questions.  First, as noted above, Toxikon had every opportunity to obtain the Patriot Agreement and have Mr. Henderson testify about it.  Second, the scope of the deposition was limited by agreement of the parties (Joint Case Management Plan, Dkt. No. 13,¶¶9 & 10.E), and Spark's designations under Toxikon's corporate representative notice.  The only questions Mr. Henderson declined to answer were about the specific terms of the Patriot Agreement, and Toxikon's Exhibit 18, which is irrelevant, beyond the agreed scope of the deposition, and not a topic listed in Toxikon's corporate representative notice.  (*See* Exhibit F).  Third, Toxikon's counsel could have asked any question about the general nature of the Spark – Patriot relationship that he wanted to, instead of trying to ambush Mr. Henderson with questions about the specific terms of the unrelated agreement.  He chose not to.

[4] Note that Toxikon's own evidence undermines any reliance that should be placed on Exhibit 18.  Toxikon Exhibit 15, at p. 33, says this regarding Toxikon's Exhibit 18:  "It did not memorialize the parties' agreement as it was in 2007 or at any point prior to that time, and Gregory never accepted it."  (Dkt. No. 19, Ex. 15, p. 33).  Thus, Exhibit 18 would not be probative of Spark's agreement with Mr. Gregory, much less its agreement with Patriot.

discuss, a Confidentiality Order, the Patriot Agreement is not in the Court's record.  Nonetheless, to the extent this Court considers Toxikon Exhibit 18, which Spark objects to, one significant provision of that document, which Toxikon fails to bring to the Court's attention, states as follows:  "Agent has no authority, express, implied or apparent, to make any warranties or representations on behalf of, [Spark] or to enter into contracts or to create obligations binding on [Spark]."  (Dkt. No. 19, Ex. 18 (emphasis added)).[5]  Thus even if the Court admits Toxikon's Exhibit 18 and assumes it is probative of the Spark-Patriot agreement, this provision conclusively demonstrates that Patriot could not have been acting as Spark's agent when it entered into the two Agreements with Toxikon, *because it lacked authority to do so*.

Toxikon also claims Patriot reached out to Toxikon in Massachusetts on behalf of Spark, not vice-versa.  (*See, e.g.*, Dkt. No. 19, p. 13–14).  Mr. Henderson's declaration and his testimony, however, confirm that Patriot, on behalf of it customer Toxikon, sent communications to Spark in Houston, Texas, requesting pricing for the first Agreement.  (Dkt. 17, Ex. 1, ¶¶6–9).  This was the first contact with Spark regarding the Agreements, and it was directed to Spark in Texas.  Patriot, on behalf of Toxikon, then requested an additional two-year add-on, by direct communications to Spark in Texas.  (*Id.*).

In this regard, even Toxikon's own Exhibit 18 is consistent with Mr. Henderson's testimony – not Toxikon's agency theory.  Toxikon's selective quoting of Exhibit 18 ignores the first line of the "Commissions" paragraph which reads, "If the Agent has a customer who has expressed an interest in entering into a contract with [Spark] utilizing [Spark's] standard contract …, the Agent will submit a written request (written includes emails) to [Spark], which includes the necessary load profile."  (Dkt. No. 19, Ex. 18).  Again, assuming for argument's

---

[5] Spark reiterates its objection to Toxikon's Exhibit 18.  Spark cites to provisions of the Exhibit merely to respond to Toxikon's one-sided, selective quoting of the unrelated agreement, in the event that the Court decides to admit Exhibit 18 into evidence.

sake that Toxikon is correct that Exhibit 18 is probative of Spark's agreement with Patriot, it confirms Mr. Henderson's testimony, in that the communications would have come *from Patriot to Spark*, in Texas, *after* Toxikon "expressed interest" in contracting with Spark using Spark's contract (which has Spark's Houston address prominently displayed).

Next, Toxikon also avoids discussing provisions of Exhibit 18 that hurts its position on the imputation of knowledge from Patriot to Toxikon.  Exhibit 18 reads, "Agent shall present [Spark's] standard contract … for energy and services with qualified customers."  (Dkt. 19, Ex. 18).  Spark's standard contract has clearly printed at the top:

> Spark Energy Gas, L.P.
> 3010 Briarpark
> Houston, Texas 77042

(Dkt. No. 17, Exs. 3, 4).  Thus, even if the Court considers Toxikon's Exhibit 18, it shows Patriot *was required to* send the contract to Toxikon, which obviously informed Toxikon that it was entering into a contract with Spark, in Houston, Texas.[6]

Toxikon improperly asks the Court to assume that other provisions of its Exhibit 18 are the same as the Patriot Agreement.  While the agreements may have similar terms, they differ in material ways.  For example, in order make it appear that Spark solicited Toxikon, Toxikon emphasizes that Exhibit 18 states, "Agent <u>*is required to*</u> locate, solicit and screen prospective customers."  (Dkt. No. 19, p.13–14).  Based on this language in the unrelated, unsigned and unauthenticated contract, Toxikon's counsel repeatedly tried to convince Mr. Henderson to testify that Patriot had *a duty* to solicit customers in Massachusetts.  (Exhibit A, at 35:24–36:16; 99:17–100:9).  As Mr. Henderson properly testified, Patriot had no such duty.  (Exhibit A, at

---

[6] Toxikon also takes inconsistent positions regarding the confidentiality of Spark's agreements with brokers. Toxikon claims Patriot's knowledge (of, among other things, the fact that Spark's operations were located in Houston) cannot be imputed to Toxikon because Patriot was "sworn to secrecy by plaintiff."  (Dkt. 19, p. 13 (citing Ex. 18, p.3)).  If Toxikon is convinced that the non-disclosure provision prevents such a disclosure by Patriot to Toxikon, then Toxikon has no legitimate basis to challenge Spark's designation of the Patriot Agreement as confidential information. .

125:14–18).  Mr. Henderson's testimony is based on his personal knowledge of the arrangement between Spark and Patriot in 2007; but it is also confirmed by the language of the Patriot Agreement which, unlike Toxikon's Exhibit 18, <u>does not</u> state that Patriot is "required" to solicit customers.

### D.    Toxikon Improperly Ignores the First Agreement with Spark

Toxikon entered into two Agreements with Spark, executed one day apart, in May 2007. (Dkt. No. 17, Exs. 3, 4).  Both include the exact same terms, except for the effective dates.  (*Id.*). Both were executed by Patriot pursuant to the same Appointment of Agent that Toxikon now attempts to disregard.  (Dkt. No. 17, Ex. 15).  The same Toxikon employee, Dexter Williams, signed off on the terms of both.  (*Id.* at TOXIKON 2, 4).  Together, these Agreements created a contractual relationship between Toxikon and Spark that was to last from June 1, 2007 to May 31, 2012.  (Dkt. No. 17, Exs. 3, 4).  The performance required of Spark, and of Toxikon, under both Agreements is identical.  (*See id*.).  As Toxikon itself acknowledges, there is nothing different about the two Agreements except the effective dates.  (Dkt. No. 19, p. 5).

Toxikon performed for three years under the first Agreement.  (Dkt. No. 17, Ex. 1, ¶15). Judging by this performance, Toxikon had no problem with the fact that it was doing business with Spark, a Texas resident, or that Spark was performing its end of the contract in Houston. Toxikon never raised any issue in three years regarding Patriot's involvement as the broker who arranged both contracts on its behalf.

Yet now, seemingly to avoid this Court's jurisdiction, Mr. Desai claims "Toxikon did not know anything about plaintiff until long after May 2007."  (Dkt. No. 19, Ex. 12, ¶8).  The truth of this statement is questionable for a number of reasons.  First, Patriot was required to provide Spark's standard contract (with Spark's Houston address on top) to Toxikon.  Second, Spark's Houston remittance address was listed on the first invoices sent to Toxikon no later than August

9

2007.  (Dkt. No. 17, Ex. 7, at SPARK000080, SPARK000118).  Third, Mr. Desai himself signed checks payable to Spark in Houston, Texas.  (Dkt. No. 17, Ex. 8).[7]  Thus, although Mr. Desai may consider August 2007 to be "well after" May 2007, Toxikon knew everything it needed to know about Spark *years* before June 1, 2010, when its performance was required under the second Agreement.

Toxikon's performance from June 1, 2007 through May 31, 2010 also calls into doubt Dexter Williams' claim that, "Had I known that Patriot was an agent for a particular gas supplier, I would not have signed any document for Patriot to do anything for Toxikon concerning natural gas."  (Dkt. 19, Ex. 13, ¶4).  Toxikon knew – not later than August 2007 but probably before – that Spark was providing its natural gas.  The invoices dated August 2007 were sent to Dexter Williams' attention.  (Dkt. No. 17, Ex. 7, at SPARK000080, SPARK000118).  The invoices were from Spark and contained Spark's Houston remittance address.  (*Id*.).  If Mr. Williams claims he would not have signed the Appointment of Agent if he had known that "Patriot was an agent for a particular gas supplier," then why did Mr. Williams, Mr. Desai, and everyone else at Toxikon, have no problem with this fact from (at least) August 2007 until May 31, 2010?  Mr. Williams, who is Toxikon's former CFO, also claims, "Prior to being contacted because of this lawsuit, I knew nothing about [Spark].  I have never communicated with anyone from [Spark]."  In contrast to this statement, Spark's invoices were sent to Mr. Williams' attention, and paid, for over three years.  Accordingly, any suggestion that the CFO of Toxikon would not have known *something* about Spark after paying it several hundred thousand dollars for natural gas, is suspect at best.

---

[7] By comparing Mr. Desai's signature on his declarations to the signature on Toxikon's checks, it is readily apparent that Mr. Desai signed the checks.

**E.      Spark's Claim Arises Out of Toxikon's Forum Related Contacts, which Occurred from 2007 until 2010**

Toxikon's narrow view, that any forum contacts occurring before June 1, 2010 do not count for jurisdictional purposes, is not supported by Fifth Circuit law.  The test for specific jurisdiction is:   "(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).  Notably, the test is *not*, as Toxikon would have it, whether the cause of action arises from *the contract* that was breached.  The test instead is whether the cause of action arises from Toxikon's "forum-related contacts." *Id*.

Toxikon's "forum-related contacts" began in May 2007 and continued through at least August 2010.  "When a defendant contracts with a resident of the forum state, the Court should evaluate 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing,' in determining whether the defendant has purposefully availed itself of the privilege of conducting business in the forum state." *Transplace Texas, L.P. v. Higgins*, No. 4:10-cv-428, 2011 WL 623172, *4 & n.1 (E.D. Tex. Jan. 19, 2011) (quoting *Burger King*, 471 U.S. at 479).  The parties' actual course of dealing for both Agreements is established by Toxikon's performance for three years under the first Agreement. That same performance also reveals the contemplated future consequences of the second Agreement, had it not been prematurely breached.

 In this regard, *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009), cited by Toxikon, is inapposite.  *McFadin* simply mentions the general rule that a plaintiff bringing multiple claims

arising out of different forum contacts must establish specific jurisdiction for each claim. *Id*. at 759. Spark, however, is not bringing "multiple claims" in this case, and *McFadin* did not consider multiple contracts arising under identical forum contacts. *Id*. at 759–63 (analyzing contract and tort claims). Consequently, *McFadin* simply has nothing to say about whether two identical contracts, both of which involve identical forum contacts by the defendant, are both relevant to the specific jurisdiction inquiry if only one was breached. *See id*.

### F. Spark's Performance Was Exclusively in Texas, and There Was no Other Place it Could Have Been

Spark could perform its obligations to Toxikon under the Agreements only in Houston Texas. Further, it is undisputed that Spark *actually did* perform all its obligations from Texas. (Dkt. No. 17, Ex. 1, ¶11). Toxikon, again relying on irrelevant and inadmissible evidence, attempts to cast doubt on Mr. Henderson's testimony[8] and confuse the issue by claiming that Spark had an "office" in Colorado. (Dkt. No. 19, p. 9). Because it relies on inadmissible evidence, Toxikon has not proven any Colorado "office" existed. Nevertheless, in the event the Court considers this inadmissible evidence, Spark will address the same to show that the "evidence" does not prove what Toxikon thinks or suggests it does.

Toxikon claims that three unrelated gas sales contracts (Exhibits A, B, and C to Toxikon's Exhibit 14) show that "plaintiff had an office in Denver Colorado since at least October 2005." (Dkt. No. 19, p. 10). Each of these contracts merely requires any notice to seller (Spark) to be mailed to a Denver, Colorado address. (Dkt. No. 19, Ex. 14, pp. 12, 15, 19). The contracts say nothing about an "office" in Denver, Colorado. Toxikon also claims that a motion

---

[8] Toxikon claims Mr. Desai "forg[ot]" about its own Texas office, but dismisses his misstatements as "minor." (Dkt. No. 19, p. 28–29). However, it claims Mr. Henderson testified "in a grossly inaccurate way." (*Id*. at p. 9). To be clear, Mr. Henderson's declaration states in the present tense that Spark's sole offices are in Houston, Texas, which is not disputed by any of the irrelevant "evidence" Toxikon attempts to put before the Court. Further, Mr. Henderson was asked in his deposition whether Spark ever had any other offices, and he answered "I do not know of any." (Exhibit A, 37:17–38:7). Toxikon's "evidence" does not even establish the existence of another "office" at any time, and it certainly does not establish that Mr. Henderson *knew* of any others.

filed in another case shows that Spark had an "office" in Colorado.  (Dkt. No. 19, p. 10–11 & Ex. 15).  The motion discusses only the authority of a single individual engaged in a joint venture with Spark in Colorado; it does not establish that Spark had an "office" in Colorado.

Toxikon suggests the previous presence of an individual in Colorado acting as a joint venture with Spark would have allowed Spark to perform its obligations to Toxikon somewhere other than Houston.  This is simply not true.  First, the only competent and admissible evidence in this Court's record establishes that Spark did in fact fully perform the Agreements with Toxikon exclusively from Houston.  (Dkt. No. 17, Ex. 1, ¶11).  Second, the only competent and admissible evidence establishes that Spark had no other location at which its performance could be accomplished.  (*Id*. at ¶12).  Third, even if Toxikon's inadmissible evidence was sufficient to demonstrate the authority of the individual acting as a joint venture in Colorado, that evidence does not establish the individual had any connection to Toxikon whatsoever, or that he would have had the capability to service Toxikon's accounts.  Fourth, Toxikon's inadmissible evidence shows the joint venture in Colorado ended no later than March 2008 (Dkt. No. 19, Ex. 15, p. 35), thus Spark obviously could not have serviced Toxikon's accounts from Colorado through May 31, 2012.  Most importantly, the simple fact is that Spark has only one location, its headquarters in Houston, Texas, where it has a gas trading floor, accounting offices, a sales department, and all of the other personnel and equipment needed to provide gas to customers like Toxikon.  (Dkt. No. 17, Ex. 1, ¶¶11–12).

Even weaker is Toxikon's argument that Spark use of brokers outside of Texas somehow means that Spark's performance was or could have been done elsewhere.  (Dkt. No. 19, p. 10, 22).  Brokers (like Patriot) independently develop relationships with potential customers (like Toxikon), and approach Spark on their customers' behalf to enter into gas contracts.  Brokers do not perform any work under Spark's gas sales contracts with customers.  Accordingly, the

13

brokers' locations have absolutely nothing to do with the work that is required of Spark in Houston.

Weaker still is Toxikon's argument that Spark may have competitors who have no Texas offices.   (Dkt. No. 19, p. 7–8).   Toxikon appears to argue that, because two of Spark's competitors have chosen to operate their business in States other than Texas, so could Spark. (*See id*.).   In other words, Toxikon argues without any evidence or legal support that it should not be subject to jurisdiction in Texas because Spark could have chosen to open up shop only in Connecticut or New Jersey, like two of its competitors did.   (*See id*.).   Given that there is no authority for the proposition that a defendant is not subject to jurisdiction because a Texas resident was free to choose *not to be a Texan*, this argument should be disregarded.

### G.   Houston Was the Hub of Activity

The vast majority of the business activity created by the two Agreements between Spark and Toxikon occurred in Texas.   In order to meet Toxikon's needs, Spark had to, among other things: (1) negotiate with other gas suppliers; (2) purchase the gas; (3) arrange for, schedule, and balance transportation of the gas; (4) communicate with local utilities; (5) generate invoices and send invoices to Toxikon; and (5) receive and process Toxikon's payments – all of which happened at Spark's headquarters in Houston.   (*Id*. at ¶11).   On the other hand, the only performance required of Toxikon was to: passively accept gas through its gas meter in Massachusetts, pay invoices to Texas, and communicate as necessary with Spark in Texas to facilitate the performance of the contract.   Therefore, everything that was required of Toxikon, except the location of the meter, had a direct connection with Texas.   (*Id*. at ¶15).

In this regard, Toxikon's claim that the "hub of activity" was in Massachusetts is not supported by the facts.   Toxikon says it passively accepted gas through its meter in Massachusetts.  (Dkt. No. 19, 20–21).   Toxikon also cites the Agreement for the proposition that

title to the gas transferred to Toxikon at the meter. (*Id.*). No "activity," however, is required by Toxikon to accept gas or for the invisible passing of legal title. In contrast, Spark's 200+ employees conduct true "activity" on a daily basis in Houston, Texas, including all the tasks needed to supply Toxikon with gas. (Dkt. No. 17, Ex. 1, ¶11). Toxikon's true activities included sending checks to Spark in Houston and communications to Spark in Houston. (*Id.* at ¶15). Thus, Houston is the hub of activity for the two Agreements.

### H.  Toxikon Directly Contacted Spark Many Times

Toxikon mischaracterizes testimony and documents in an effort to downplay its direct communications with Spark. Toxikon claims that there are only "two phone calls" to Spark. Nonetheless, a closer look at Spark's Exhibit 9 shows that many of the direct communications between Toxikon and Spark were initiated by Toxikon. There are at least 10 notes of contacts that appear to be initiated by Toxikon, and 14 others that may have been initiated by either party. (Exhibit G).

### I.  *Moncrief* is not the "Most Important Authority" and does not Support Toxikon's Argument

According to Toxikon, the "most important authority" for this analysis is *Moncief Oil Int'l, Inc. v. OAO Gazprom*, 481 F.3d 309, 312–13 (5th Cir. 2007). Toxikon ignores the fact that *Moncrief* itself is distinguishable from this case. The plaintiff in *Moncrief* was "an international company engaged in various projects around the world." *Id.* at 313. Unlike Spark, whose gas trading operations exist only in Texas, the *Moncrief* plaintiff had numerous other locations "around the world" where it could perform, and in fact had "*even established an office in Russia specifically for this relationship*" with the Russian defendant (a fact Toxikon ignores in its brief). *Id.* (emphasis added). Clearly Spark never opened an office in Massachusetts specifically to serve its relationship with Toxikon.

Toxikon also makes too much of the provision in the Agreements indicating that they should be governed by New York law.  This is a far cry from the "most important jurisdictional fact in this case" (Dkt. 19, p. 2), and certainly does not preclude jurisdiction in Texas under *Moncrief*.  In *Moncrief* the Texas plaintiff contracted with a Russian defendant.  481 F.3d at 313.  The contract included not only a choice of law clause (Russian), but also a choice of forum (arbitration) and a choice of venue (Russia).  *Id.*  The *Moncrief* opinion concludes that where parties select not only the governing law, but also *the location and the forum* for their disputes,[9] their choice is an important indication of whether a defendant could anticipate being haled into a *different* location and forum.  *Id.*  Because Spark and Toxikon did not choose the location and forum for their dispute resolution, the choice-of-law provision is not decisive to this Court's jurisdiction analysis.

### III.   GENERAL JURISDICTION EXISTS OVER TOXIKON

Toxikon's Reply adds little to the general jurisdiction analysis.  Even with Mr. Desai's new declaration, it is still undisputed that:  Toxikon registered to do business in Texas, and still is registered to do business in Texas to this day.  (Dkt. No. 17, Ex. 10–11).  Toxikon had a registered agent in Texas from April 2009 until this lawsuit was filed in 2011.  (*Id.*).  Toxikon had an employee, with a home office, in Texas in 2009.  (*Id.* at Ex. 13–14).  Toxikon has made sales in Texas during every month of every year from 2007 to 2010.  (*Id.* at Ex. 17).  Accordingly, this Court has general jurisdiction over this matter.

### IV.   VENUE SHOULD REMAIN IN THIS COURT

#### A.   Private Factors Weigh Against Transfer

---

[9] The Fifth Circuit quotes *Jones v. Petty-Ray Geophysical, Geosource, Inc.*, 954 F.2d 1061, 1069 (5th Cir. 1992), that "forum-selection and choice-of-law clauses 'indicate rather forcefully' that defendant 'did not purposefully direct its activities towards Texas.'"  *Id.*   Toxikon selectively quotes from this quote, leaving off the "forum-selection" part.

Toxikon continues to overstate the role that Patriot may play in this case, and the "source of proof" that might be located in Massachusetts. Toxikon speculates that Patriot's witnesses and sources of proof will be in Massachusetts (Dkt. No. 19, p. 37). Toxikon offers no evidence of this alleged fact, thus it is not entitled to any weight. Patriot has offices in Dallas, Texas (Dkt. No. 17, Ex. 6) and its witnesses or sources of proof are equally likely to be located in Dallas, as opposed to Massachusetts. Accordingly, this factor does not weigh in Toxikon's favor.

Toxikon also overstates the possibility that Patriot will need to be subpoenaed by this Court. (Dkt. No. 19, p. 37–38). First, it is abundantly clear that, as to Spark's breach of contract claim against Toxikon, all the evidence from Patriot that is necessary – the Appointment of Agent – is already in the record. This document, unquestionably, gives Patriot apparent authority to act on behalf of Toxikon. (Dkt. No. 17, Ex. 5 ("[A]ny third party receiving a duly executed copy or facsimile of this Appointment of Agent may act hereunder."). This evidence is conclusive as to the enforceability of the Agreements between Spark and Toxikon, because it establishes (at minimum) the apparent authority of Patriot. Thus, if Toxikon needs testimony from Patriot, it will have nothing to do with its defense against Spark's claim. Instead, it will be to try to establish some kind of claim against Patriot. This is why Toxikon has stated unequivocally that it will add Patriot as a party if its Motion to Dismiss is denied (see Dkt. No. 13, ¶6), making the compulsory process unnecessary.

Toxikon alleges that "basic logic" and "common sense" dictate that a Massachusetts court has more familiarity with New York law than this Court. (Dkt. No. 19, p. 39, 40). Spark simply disagrees that a federal court that is closer to (but not in) a particular State has any more familiarity with that State's law than any other federal court. Spark also disagrees with the implication that this Court is not familiar or in a position to become familiar with New York law as necessary. Moreover, Massachusetts is not in the Second Circuit, so Toxikon cannot even

17

claim that the Massachusetts court would have any more familiarity with Second Circuit cases interpreting New York law.  This Court is perfectly capable – just as much as any federal court in Massachusetts – of applying the simple contract (and possibly agency) law of New York if applicable.  And once again, there will be no need for "experts" on New York law.

### B.   Public Factors Weigh Against Transfer

In order to make this case appear more important to Massachusetts, Toxikon again references Massachusetts regulations governing the sale of gas.  But this case involves no complex issues that bring those regulations into play.  Toxikon does not allege that Spark violated any Massachusetts regulation.  Moreover, Toxikon fails to identify any provision of the Agreement that runs afoul of any Massachusetts regulation.   There is no allegation that Spark's sale of gas was improper under any Massachusetts regulation from June 1, 2007 until August 2010, or that the continued sale through May 2012 would have been improper.   This is simply a breach based on Toxikon's refusal to accept gas for the remainder of the second Agreement.  Texas has just as much of a public interest, if not more, in seeing its residents' contracts honored as Massachusetts does in giving its residents a forum to litigate their breach.

Lastly, Toxikon claims unequivocally that New York law applies.  (Dkt. No. 19, p. 26).  Then Toxikon argues, inconsistently, that potential conflicts of law weigh in favor of transfer.  (*Id*. at 40).  If New York law applies, there is no conflict.  Moreover, transfer would not cure the potential conflict that Toxikon alleges (i.e., whether the reference to Massachusetts statutes affects the New York choice of law provision).  Given that this issue can arguably be raised regardless of whether the case is litigated in Texas or Massachusetts, it has no bearing on venue and should thus, be disregarded.

18

## V.  CONCLUSION

 Not only does this Court have specific and general jurisdiction, but venue is proper in Houston, Texas.  In light of the above, Spark Energy Gas, LP respectfully requests that the Court deny Toxikon Corporation's Motion to Dismiss for Lack of Personal Jurisdiction & Alternatively Motions to Transfer Venue Under 28 U.S.C. §§ 1406(a) or 1404(a), and for such further relief to which Spark is entitled.

### CERTIFICATE OF SERVICE

 I hereby certify that on June 27, 2011, a copy of the foregoing was served on the following counsel via the Court's ECF email Notice of Electronic Filing.

Mr. Fred Dietrich
fdietrich@dietrich-law.com
Counsel for Defendant Toxikon Corporation


        /s/ *Joshua C. Thomas*